**+IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF MISSISSIPPI**

**UNITED STATES OF AMERICA**

**V. NO. 4:26-CR-13**

**CORDARO FRANKLIN**

# OPINION AND ORDER

Cordaro Franklin was indicted for being a felon in possession of firearms. Franklin moves to suppress evidence obtained from the search of his residence based on arguments that the search warrant lacked probable cause and the good faith exception to the exclusionary rule does not apply. Because the Court concludes that the good faith exception applies, suppression will be denied.

## I
## Relevant Procedural History

On January 14, 2026, a federal grand jury in the Northern District of Mississippi returned a one-count Indictment against Cordaro Franklin charging him with being a felon in possession of firearms in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(8). Doc. #1 at PageID 2. The evidence underlying the Indictment was obtained from an October 9, 2025, search of Franklin's residence at 333 Muscadine Street in Greenville, Mississippi. Doc. #31-1; Doc. #31-4 at 6.

On June 1, Franklin filed a motion to suppress the evidence. Doc. #31. The government responded in opposition on June 8. Doc. #38. Franklin did not reply.

On July 22, the Court held an evidentiary hearing on the motion to suppress. Doc. #41. At the conclusion of the hearing, the Court took the motion under advisement. *Id.*

## II
## Standard

On a motion to suppress evidence, the "defendant normally bears the burden of proving by a preponderance of the evidence that the challenged search or seizure was unconstitutional."

*United States v. Waldrop*, 404 F.3d 365, 368 (5th Cir. 2005). If the defendant makes a prima facie showing of illegality, then the burden shifts to the government to demonstrate why the evidence should nonetheless be admitted. *United States v. Ellis*, 330 F.3d 677, 679 (5th Cir. 2003).

## III
## Background

### A. The Affidavit

On October 6, 2025, Brandi Washington, "a Narcotics Investigator for the Greenville Police Department," signed an affidavit requesting a search warrant regarding 333 Muscadine Street in Greenville, Mississippi. Doc. #31-1 at PageID 66, 67.

#### 1. Washington's training and experience

Washington's affidavit details that she has been employed in law enforcement for approximately six-and-one-half years, is a certified law enforcement officer, has attended various schools and classes in law enforcement, and has gained several certifications as a law enforcement officer. *Id.* at 67. As a patrol officer, Washington assisted in numerous criminal investigations of felony crimes, including drug crimes. *Id.* In October 2021, Washington was promoted to the Criminal Investigation Division where she spent four years first as a crime stoppers investigator and then as a criminal investigator. *Id.* In April 2025, Washington moved to the Narcotics Investigations Division where she worked with other law enforcement agencies, as well as numerous confidential informants and citizen informants. *Id.* In her experience, confidential informants and citizen informants have provided information that assisted in the arrests and convictions of gang members, narcotics traffickers, and criminal offenders; and the information provided by informants also assisted in the seizure of assorted gang paraphernalia, narcotics, and other contraband. *Id.* At the Greenville Police Department, Washington receives daily training on working on drug investigations. *Id.* at 67–68.

Washington's affidavit also describes the knowledge she has gained from her training and experience regarding drug trafficking. *Id.* at PageID 78–81. Among other things, she knows the methods employed by drug traffickers to distribute controlled substances; that persons involved in the use, sales, transportation, storage, and conspiracy to distribute powder cocaine will continue to be involved in the use, sales, transportation, storage and conspiracy to distribute powder cocaine and will continuously have most, if not all, the evidence of such behavior within their temporary or permanent residences, businesses, vehicles, storage areas, storage containers, or on their persons; and that drug traffickers frequently use vehicles under their control to transport, conceal, and store evidence of drug trafficking. *Id.* at PageID 78, 79, 80.

**2. 333 Muscadine Street**

Washington's affidavit relays that Cordaro Franklin's residence located at 333 Muscadine Street in Greenville, Washington County, Mississippi, is a single-family house, wooden and light blue in color, with black bars on the windows at the front of the house and a dark in color rooftop. *Id.* at PageID 64, 82. The home has a black storm door facing west, a concrete walkway and driveway to the west side, a white air conditioning unit facing north on the side, and an unnumbered black mailbox on a stained wooden 4x4 stand. *Id.*

**3. Citizen informant**

According to Washington's affidavit, in May 2025, an unnamed citizen informant ("CI") told her that the house located on North Edison Street belonging to Freddie Anderson was a known location where narcotics were sold daily. *Id.* at PageID 68. The CI specified that Anthony Anderson and Franklin run a drug operation together in which Anthony would drive a red Nissan and a black Nissan from Jackson, Mississippi, to Persimmons Street in Greenville, Mississippi; walk through backyards and a small, grassy walkway from Persimmons Street to 458 North Edison

Street while carrying a black backpack; and leave narcotics at the house for Freddie to sell. *Id.* at PageID 68–69. The CI stated that after several altercations, Anthony and Franklin stopped bringing illegal narcotics to 458 North Edison Street and instead, Anthony began to drop off illegal narcotics and pick up money from the sale of illegal narcotics at 343 and 333 Muscadine Street in Greenville, Mississippi. *Id.* at PageID 69. The CI further stated that a man named "Cord" ran the trap house, and lived next door to the trap house in a blue house with a lot of cars in the yard and a black drop top looking car. *Id.*

**4. Encounters at 333 Muscadine Street**

Washington's affidavit avers that on September 29, 2025, Greenville police officers, including Washington, were in the 300 block of Muscadine Street due to constant complaints from concerned citizens regarding narcotics in the area. *Id.* at PageID 72. There, they saw a black male standing on the porch of a blue one-story residence, which the officers were familiar with as a drug house. *Id.* at PageID 70, 71, 72, 75. After the black male saw their police car, he turned and sprinted to a white Toyota Camry parked in front of the house, quickly pulled out in front of their unit, ran a stop sign, and turned without using a signal. *Id.* The officers conducted a traffic stop, and the driver identified himself as Tommy Sardin. *Id.* at PageID 70, 71, 73, 75. After Sardin gave several contradicting statements while appearing suspicious,[1] he was placed under arrest. *Id.* The officers searched Sardin's car and found marijuana, a marijuana grinder, a crack pipe, a steel wool scouring pad, and a small blue plastic pill bottle known for holding crack cocaine. *Id.* at PageID 70, 72, 73–74, 75.

[1] Sardin initially stated that he ran the stop sign and did not use a signal because he was in a rush to pick up his wife, that he did not have anything in his car the officers should know about, and that the officers could search his car. Doc. #31-1 at PageID 70, 71, 73, 75. He later stated that his wife had personal items in the car and did not want anyone in the car, that there was nothing in the car, and that he was just in a hurry to go and pick up his wife from work. *Id.* Even later, Sardin stated that there was something personal that belonged to his wife in the glove box of the car, and his wife did not want him to see it. *Id.* at PageID 70, 71–72, 73, 75. While making these statements, Sardin seemed anxious, jittery, and sweaty, and spoke quickly. *Id.* at PageID 70, 73, 75.

After Sardin was taken into custody at the Greenville Police Department, he was read *Miranda* warnings and agreed to give a voluntary statement. *Id.* at PageID 71, 76. Sardin then admitted to purchasing crack cocaine rocks from a tall dark male at 333 Muscadine Street, hiding some crack cocaine rocks in the car, and throwing some crack cocaine rocks out of the car.[2] *Id.* at PageID 70, 71, 72, 74, 76. Officers searched the car again and located what appeared to be two crack cocaine rocks and a broken pipe on the driver's side of the vehicle hidden inside the carpet liner of the floor. *Id.* at PageID 70, 72, 74, 76. During a field test, the rocks tested positive for controlled substances. *Id.* at PageID 71.

The affidavit continues that on October 2, 2025, Greenville police officers, including Washington, were patrolling the area of Nelson and Muscadine Street because that area was known as a heavy narcotic area. *Id.* at PageID 77. There, they noticed Darrell Washington in a silver Chevy parked in front of 333 Muscadine Street and a black, tall, stocky-built male standing by the vehicle. *Id.* When the officers drove to the stop sign at South Harvey and Nelson Street, which is in plain view of the 300 block of Muscadine Street, the two males went their separate ways, and Darrell drove away without putting on his seatbelt. *Id.* The officers conducted a traffic stop and, noticing a strong smell of what appeared to be marijuana coming from the vehicle, asked Darrell to step out of the vehicle. *Id.* After Darrell advised that he had smoked marijuana, he was arrested. *Id.* The officers used a K9 to conduct an open air sniff test, during which the K9 alerted several times. *Id.* The officers then searched the vehicle and found a black bag on the passenger side of the vehicle containing crack cocaine, methamphetamines, steel wool, and a glass pipe with residue. *Id.*

[2] One portion of the affidavit states that Sardin told the officers that he purchased the crack cocaine rocks from 331 Muscadine Street. *Id.* at 76. That statement contradicts another part of the affidavit which describes Sardin telling the officers that he purchased the crack cocaine at 333 Muscadine Street. *Id.* at PageID 70.

**5. Washington's belief**

Based on her experience, the information provided by the CI, and the encounters at 333 Muscadine Street, Washington believed that there was probable cause for the issuance of a search warrant commanding the search of 333 Muscadine Street and any vehicles under Franklin's control because she believed that the search of such property would result in corroborating evidence tending to show that Franklin and his associates committed a felony by conspiring to distribute illegal narcotics and distributing illegal narcotics. *Id.* at PageID 68. Magistrate Judge Michael Prewitt authorized the search of Franklin's residence and vehicles on October 6, 2025, and the search was conducted on October 9, 2025. *Id.* at PageID 62; Doc. #31-4 at 6.

**B. Interrogation of Sardin**

At the July 22 evidentiary hearing on the motion to suppress, Franklin entered into evidence a video of the Greenville Police Department's interrogation of Sardin. Doc. #42. During the interrogation, the officers inquired about Sardin's educational background, and Sardin responded that his highest level of education was high school, he was in the special education program during high school, and he cannot read well. Def. Ex. F (Video of Interrogation of Tommy Sardin)[3] (Part 2), at 1:28–2:14. Washington then confirmed that Sardin understood what an attorney is, and read and explained to Sardin his *Miranda* rights. *Id.* at 2:22–7:06. Sardin conveyed that he understood his rights, and then waived his right to remain silent, stating "I want to talk to y'all," and signed a document indicating the same. *Id.* at 7:07–9:06. Sardin subsequently admitted that he ran a stop sign and failed to use his signal. *Id.* at 10:35–11:10. He also acknowledged that police confiscated a Brillo sponge, a marijuana grinder, marijuana, crack cocaine, and a broken crack pipe after searching his vehicle. *Id.* at 14:32–14:41, 15:23–15:44. Sardin further acknowledged that there

[3] This defense exhibit was incorporated into the hearing by reference to Document #39, the docket text for which indicates that defense counsel conventionally submitted the video on a wallet drive.

was a cup that contained a mixture of Kool-Aid and alcohol in the car, *id.* at 13:26–14:30; and that upon seeing law enforcement, he threw some crack cocaine out of the window of his vehicle, *id.* at 14:55–15:21, 38:22–39:23.

Throughout the interrogation, the police questioned Sardin regarding his presence on the porch at 333 Muscadine Street. According to Sardin, he was stopped at a stop sign when a tall, skinny, dark-skinned man wearing blue jeans flagged him down from a bicycle, *id.* at 11:58–12:05, 13:19–13:44, 16:45–16:47, 19:58–20:21, 25:14–25:23, 30:26–30:39, 32:50–33:31;[4] the man led him to the porch of the house where the police saw him, *id.* at 11:45–11:57; and the man gave him the drugs while he was on the porch, *id.* at 20:25–20:29. Initially, Sardin seemed to state that the man led him to the porch of a house, traveled to a different location on his bicycle, and then returned to the porch to sell him the drugs. *Id.* at 25:24–25:55. Later, however, Sardin clarified that the man led him to the front porch of a house, entered that same house, and then returned to the porch to sell him the drugs. *Id.* at 31:12–32:08. Sardin claimed he never entered the house. *Id.* at 25:44–25:50.

Several times during the interrogation, Washington questioned the veracity of Sardin's statements, stating once that Sardin "told four lies." *Id.* at 24:00–24:13, 34:34–34:40, 38:29–39:19. At the conclusion of the interrogation, Sardin stated that he "w[ould] come up hot" if he were drug tested because he "smokes weed." *Id.* at 39:20–39:43.

## IV
## **Discussion**

In his motion to suppress, Franklin submits that "[t]he issuing judge improperly authorized the Warrant, the Warrant was overly broad, lacked probably [sic] cause and was 'bare bones;'"

---

[4] Sardin claimed several times that he was unaware of the man's name. Def. Ex. F (Part 2), at 11:18–11:32, 13:01–13:14, 17:47–17:56, 25:14–25:23, 30:26–31:09.

and "there can be no good faith exception because the Warrant lacked an indicia of probable cause, the issuing judge abandoned his judicial role and the author of the Affidavit in [s]upport of the Warrant cannot rely upon the 'good faith' exception." Doc. #31 at PageID 53.

The government responds that the information set forth in the affidavit was accurate and supported by an informant and officers' observations; and that there was enough indicia of probable case for officers to rely on the warrant in good faith. Doc. #38 at 6, 8–9.

**A. Fourth Amendment**

Under the Fourth Amendment to the United States Constitution:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized.

U.S. CONST. amend. IV. "The bulwark of Fourth Amendment protection, of course, is the Warrant Clause, requiring that, absent certain exceptions, police obtain a warrant from a neutral and disinterested magistrate before embarking upon a search." *Franks v. Delaware*, 438 U.S. 154, 164 (1978).

"The [Fourth] Amendment says nothing about suppressing evidence obtained in violation of [its] command." *Davis v. United States*, 564 U.S. 229, 236 (2011). Rather, the exclusionary rule "bars the prosecution from introducing evidence obtained by way of a Fourth Amendment violation" to "compel respect for the constitutional guaranty." *Id.* at 231–32, 236 (quoting *Elkins v. United States*, 364 U.S. 206, 217 (1960)); *see Stone v. Powell*, 428 U.S. 465, 486 (1976) (exclusionary rule "is not a personal constitutional right" but "a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect.") (quoting *United States v. Calandra*, 414 U.S. 338, 348 (1974)). "The primary justification for the exclusionary rule … is the deterrence of police conduct that violates Fourth Amendment rights." *Stone*, 428

U.S. at 486.

**B. Good Faith Exception**

There are several exceptions to the exclusionary rule.[5] The good faith exception allows the admission of evidence "obtained in the reasonable good-faith belief that a search or seizure was in accord with the Fourth Amendment." *United States v. Leon*, 468 U.S. 897, 909 (1984) (quoting *Illinois v. Gates*, 462 U.S. 213, 255 (1983) (White, J., concurring)). The exception applies when a law enforcement officer relied on a search warrant "even though the affidavit on which the warrant was based was insufficient to establish probable cause." *United States v. Pope*, 467 F.3d 912, 916 (5th Cir. 2006) (quoting *United States v. Satterwhite*, 980 F.2d 317, 320 (5th Cir. 1992)). The "good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization. In making this determination, all of the circumstances … may be considered." *Leon*, 468 U.S. at 922 n.23. "Applying that framework, [the court] ask[s] two questions: '(1) whether the good-faith exception to the exclusionary rule applies; and (2) whether probable cause supported the warrant.'" *United States v. Wilson*, 153 F.4th 478, 484 (5th Cir. 2025) (quoting *United States v. Marmolejo*, 89 F.3d 1185, 1198 (5th Cir. 1996)).

The Fifth Circuit will "uphold an officer's good-faith reliance on a warrant unless one of

[5] *See Murray v. United States*, 487 U.S. 533, 538 (1988) ("[W]here an unlawful entry has given investigators knowledge of facts *x* and *y*, but fact *z* has been learned by other means, fact *z* can be said to be admissible because derived from an 'independent source.'"); *see also Nix v. Williams*, 467 U.S. 431, 444 (1984) ("If the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means … then the deterrence rationale has so little basis that the evidence should be received."); *Utah v. Strieff*, 579 U.S. 232, 238 (2016) ("Evidence is admissible when the connection between unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance, so that 'the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained.'") (quoting *Hudson v. Michigan*, 547 U.S. 586, 593 (2006)); *Harris v. New York*, 401 U.S. 222, 224–25 (1971) (exclusionary rule does not prevent prosecution from introducing illegally obtained evidence to impeach defendant's testimony at trial).

four conditions apply:"

> (1) the issuing-judge "was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth"; (2) the issuing-judge "wholly abandoned his judicial role" in such a manner that "no reasonably well trained officer should rely on the warrant"; (3) the underlying affidavit is "bare bones" ("so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"); or (4) the warrant is "so facially deficient … that the executing officers cannot reasonably presume it to be valid."

*United States v. Mays*, 466 F.3d 335, 343 (5th Cir. 2006) (quoting *United States v. Gibbs*, 421 F.3d 352, 358 (5th Cir. 2005)); *accord United States v. Morton*, 46 F.4th 331, 336 (5th Cir. 2022).[6]

**1. Misled issuing-judge**

For various reasons, Franklin maintains that the affidavit "should have never led (actually misled) the Court into believing that there was probable cause to issue the Warrant and to send police officers into a citizen's home." Doc. #31 at PageID 53–54.

*a. False Statement*

Franklin first argues that Judge Prewitt was misled because "Washington inform[ed him] … that Sardin said in his interrogation … [that] 'he threw the crack cocaine he purchased from 333 Muscadine in the grass'" though Washington later "admitted he '[did not] state 333 [but] he [gave] the direction." Doc. #31 at PageID 57 (citations omitted). According to Franklin, "Washington took her observations and a piece of Sardin's statement and 'puffed her wares' by telling Judge Prewitt that Sardin said he purchased the drugs at 333 Muscadine" though there was "no such statement from Sardin." *Id.*

[6] Franklin contends that the good faith exception cannot apply because "the Affiant (GPD Officer Brandi Washington) was one and the same person who sought the Warrant, and exercised/served the Warrant," and "[t]his fact alone destroys any 'good faith' exception." Doc. #31 at PageID 54 & n.1. The Fifth Circuit has rejected this argument. *See United States v. Beaumont*, 972 F.2d 553, 562 (5th Cir. 1992) (per curiam) (good faith exception applied when "the executing officer was the affiant," among other things); *accord United States v. Hongo*, No. 23-30148, 2023 WL 6162788, at *2 (5th Cir. Sept. 21, 2023) (per curiam). *See also United States v. Scully*, 951 F.3d 656, 667–68 (5th Cir. 2020) (good faith exception applied when "Agent Ploetz was both the affiant and executing officer, and … he instructed the other officers on what places to search").

The government responds that "the information obtained from Investigator Washington, both from observations of officers on Muscadine Street at the time as well as from the statement given by Tommy Sardin following his arrest, was that Sardin purchased the crack cocaine found in his vehicle from someone at the house at 333 Muscadine Street;" and "[t]his information was set forth in the affidavit when Investigator Washington stated that Sardin had purchased the crack cocaine from 333 Muscadine Street, which is exactly what Sardin told her, even if Sardin did not reference the house by its physical address." Doc. #38 at 8, 9.

Under the United States Supreme Court's *Franks* decision, a search warrant must be voided if (1) the supporting affidavit contains a false statement; (2) the false statement was made intentionally or with reckless disregard for the truth; and (3) after setting aside the false statement, the affidavit's remaining content is insufficient to establish probable cause. 438 U.S. at 155–56; *accord United States v. Glenn*, 935 F.3d 313, 321 (5th Cir. 2019).

Here, Washington's affidavit represents, "Sardin stated … at the Greenville Police Department that he threw the crack cocaine he purchased *from 333 Muscadine Street* in the grass." Doc. #31-1 at PageID 70 (emphasis added). The statement is technically inaccurate since Sardin told Washington only, "The piece I bought from *there*, I throwed that out the window." Def. Ex. F (Part 2), at 15:15–15:20 (emphasis added). However, the Court concludes that Washington did not make this statement with reckless disregard for the truth since she was on the 300 block of Muscadine Street when the incident involving Sardin occurred;[7] she witnessed Sardin standing on the porch of a blue, one-story house that she was familiar with as being a drug house;[8] and Sardin told her that he bought drugs on the porch of the house.[9] It appears that Washington merely

[7] Doc. #31-1 at PageID 70, 71, 72, 75.

[8] *Id.* at PageID 72.

[9] Def. Ex. F (Part 2), at 20:25–20:29.

inferred the meaning of Sardin's statement based on her own personal observations and conversation with him. *See United States v. Bell*, 832 F. App'x 298, 301 (5th Cir. 2020) (per curiam) ("Either 'direct observation' or 'normal inferences' can support … a connection [between the house to be searched and the evidence sought].") (quoting *United States v. Freeman*, 685 F.2d 942, 949 (5th Cir. 1982)). Having found that the inaccurate statement was not made intentionally or with reckless disregard for the truth, the Court need not determine whether the search warrant affidavit would fail to establish probable cause if such statement was excised. *See Glenn*, 935 F.3d at 321 ("All three questions must be answered in the affirmative for the motion to be granted."). The evidence will not be suppressed based on Washington's inclusion of the inaccurate statement in her affidavit. *See United States v. Danhach*, 815 F.3d 228, 235 (5th Cir. 2016) ("If the defendant fails to meet his burden of proving 'that false information was given intentionally or recklessly …, the warrant did not violate the Fourth Amendment and the evidence should not [be] excluded.'") (quoting *United States v. Cavazos*, 288 F.3d 706, 710 (5th Cir. 2002)).

*b. Omission of Certain Information*

Franklin also argues that Judge Prewitt was misled because "[t]here is no mention … in the application for a search warrant" that "Sardin sa[id] a man on a bicycle flagged him down and sold him the crack;" "[n]or, is there any mention of Washington … accusing Sardin of lying four times during the interrogation;" and "where Sardin says he is 'high' doesn't get mentioned … either."[10] Doc. #31 at PageID 57 (emphases omitted). The government responds that "[Franklin]'s assertion regarding the bicyclist is incorrect, to the extent that it implies Sardin bought the narcotics from a location other than 333 Muscadine Street" because "[i]t appears from [Sardin's] recorded

[10] According to Franklin, Washington "conveniently leaves out critical information, i.e. the unknown reliability of the May 2025 'citizen informant;' the mysterious bicyclist who approached Sardin and sold him the drugs; Sardin lying to [her] during the interrogation, etc." Doc. #32 at PageID 157.

statement that the person on the bicycle rode the bicycle to 333 Muscadine where that person retrieved the crack cocaine to sell to Sardin." Doc. #38 at 8. The government also argues that "[i]t is not important who, specifically, sold him the cocaine[,] only the location from which it was sold." *Id.* at 8–9.

There is no evidence that would establish Washington's intent to mislead Judge Prewitt by omitting information from Sardin's testimony and regardless, the omission of any such information is of no consequence to the probable cause inquiry.

First, the Court agrees with the government that Sardin's testimony leads to the conclusion that Sardin was on the porch of 333 Muscadine Street when he saw a man go into the house, and upon the man's return to the porch, Sardin bought drugs from him. The details of how Sardin came to be on the porch is of much less importance than the fact that he bought drugs that came from 333 Muscadine Street, a fact included in Washington's affidavit.

Next, Washington's accusation that Sardin was untruthful during the interrogation is immaterial because in issuing a search warrant, "the magistrate is concerned, not with whether the informant lied, but with whether the affiant is truthful in [her] recitation of what [she] was told." *United States v. Davis*, 443 F. App'x 9, 13 (5th Cir. 2011) (per curiam) (quoting *McCray v. Illinois*, 386 U.S. 300, 307 (5th Cir. 1967)).

Finally, Washington was not precluded from using Sardin's statements in the affidavit just because Sardin admitted that he "smokes weed" and would "come up hot" if drug tested. Washington had the opportunity to assess Sardin's credibility and demeanor when questioning him, and her inclusion of his statements in the affidavit is evidence that she found Sardin's statements to be reliable despite his confession that he was under the influence of marijuana, a reasonable conclusion since she had firsthand knowledge that after Sardin was seen on the porch

of 333 Muscadine Street, law enforcement discovered he possessed crack cocaine. *See Hale v. Kart*, 396 F.3d 721, 730 (6th Cir. 2005) ("Although it is possible that an … intoxicated person may be less reliable than a detached and uninterested observer who is sober, it is equally possible that those same factors can make a witness more inclined to be truthful than they otherwise might."); *United States v. Allen*, 297 F.3d 790, 795 (8th Cir. 2002) (plaintiff "provide[d] no authority for the proposition that persons under the influence of methamphetamine cannot provide accurate information"). Nor does Washington's exclusion from the affidavit that Sardin stated he was under the influence of drugs when he gave his statement necessitate a rejection of her credibility assessment. *See United States v. Young*, 877 F.2d 1099, 1103 (1st Cir. 1989) ("The law does not require an officer swearing out an affidavit for a warrant to include all possible impeachment material. It need only explain that the officer has found the informant to be reasonably reliable.") (citing *Gates*, 462 U.S. at 230–39); *accord United States v. Burgos-Montes*, 786 F.3d 92, 102 (1st Cir. 2015). *See also United States v. Stewart*, 337 F.3d 103, 106 (1st Cir. 2003) (undisclosed information of drug use "of extremely minor significance in the probable cause calculus"); *United States v. Reed*, No. 7-4012, 2008 WL 3990969, at *2 (W.D. Mo. Aug. 21, 2008) (drug use immaterial where known informant did not appear to be under influence of controlled substance at time she gave her statement, and statements were against her own penal interest and based on her own first-hand knowledge).

The search warrant will not be suppressed based on Washington's exclusion of certain information from Sardin's interrogation.

**2. Abandonment of judicial role**

Because Franklin asserts only in a conclusory manner that "the issuing judge abandoned

his judicial role,"[11] Doc. #31 at PageID 53, the Court declines to address whether Judge Prewitt abandoned his judicial role when he issued the search warrant for 333 Muscadine Street. *See United States v. Symmank*, 397 F. App'x 991, 993–94 n.1 (5th Cir. 2010) (per curiam) (defendant abandons claim regarding good faith exception by not briefing it even if he alluded to exception); *United States v. Hidalgo*, 385 F. App'x 372, 375 (5th Cir. 2010) (per curiam) ("A defendant normally bears the burden of proving by a preponderance of the evidence that the challenged search or seizure was unconstitutional.") (quoting *Waldrop*, 404 F.3d at 368).

**3. Bare bones affidavit**

Franklin argues that the affidavit was "'bare-bones' at best" because it relied on "'boiler plate' statements" and "lack[ed] supporting information." Doc. #31 at PageID 53–54. According to Franklin, the use of boiler plate language diminishes the credibility of the affidavit because the boilerplate language is "used to support [Washington]'s suspicion of drug dealing[] when in truth and fact, [such language is] contained in all Affidavits requesting a Warrant." *Id.* at PageID 55. In support of his bare-bones affidavit arguments, Franklin cites two cases—the Fifth Circuit's decisions in *United States v. Weaver*, 171 F.4th 780 (5th Cir. 2026), and *United States v. Cutwright*, 247 F. App'x 499 (5th Cir. 2007).[12] Doc. #32 at PageID 155–56, 157.

In *Weaver*, "law enforcement officers executed a search warrant at [Lexus] Weaver's home" supported by an affidavit in which Officer Garrett Mittan "outlined a series of three controlled drug buys using a confidential informant" where the "CI at the direction and surveillance of Officer Mittan and other law enforcement personnel purchased an undisclosed amount of crack cocaine from … Weaver." *Id.* at 783, 784. Officer Mittan's affidavit "asserted

---

[11] Unsurprisingly, the government did not respond to this conclusory assertion.

[12] Franklin inaccurately cites *Cutwright* as "247 F. 2nd 499 (5th Cir. 2007)," Doc. #32 at PageID 157, which the Court attributes to a scrivener's error.

that the CI was reliable based on the officers' prior experience with him, and the CI was knowledgeable regarding the appearance, transportation, and use of controlled substances." *Id.* at 783–84. The Fifth Circuit held the affidavit was not bare bones because it "contained sufficient detail," including "time frames of the drug buys; the address of Weaver's residence; the type of drug; the controlled buy process; a conversation among the CI, Weaver, and a named third individual; and the make and model of a vehicle driven by Weaver." *Id.* at 786.

In *Cutwright*, law enforcement obtained a search warrant to search Jerome Cutwright's residence "based on information communicated to Deputy [Bob] Lowe by a confidential informant who had previously provided one of Lowe's colleagues with reliable tips about narcotics trafficking and other criminal offenses on at least five occasions." *Id.* at 500. "The confidential informant told Lowe that he had seen a large amount of bagged cocaine at Cutwright's residence and that Cutwright had made a sale of cocaine in his presence." *Id.* After evidence of items found during the search of his residence were admitted at trial, Cutwright was found guilty of possession with intent to distribute cocaine and cocaine base. *Id.* On appeal, Cutwright argued that "the affidavit used to support the search warrant was 'bare bones' and that accordingly no reasonable officer could have relied on it in good faith." *Id.* at 501. The Fifth Circuit disagreed, holding that "Lowe's affidavit [wa]s not bare bones" because "[i]n it, Deputy Lowe swore that the informant related particular details of the contraband at the residence and that the informant had previously identified cocaine and provided accurate information about the location of narcotics on at least five separate occasions;" and "Lowe also knew from personal experience as a … law-enforcement officer that Cutwright lived at the address provided." *Id.* So, "[t]he warrant facially provided a good-faith basis upon which the officers could rely." *Id.*

Franklin argues that *Weaver* "helps [his] argument in his case" because "[t]here were no

controlled buys at 333 Muscadine;" "Sardin was hardly a reliable informant" since "[h]e said he had just bought crack from a guy on a bicycle on Muscadine but this came after 'lying' four (4) times, saying the seller approached him on another street, not being searched before the transaction, being high during the interrogation, and ironically, admitting he couldn't read and write and showing a lack of understanding when he was Mirandized;" "there was no surveillance of [Sardin's] actual transaction;" the CI was "unknown by Investigator Washington for reliability," and Washington "provides nothing to verify his information;" and while Washington's affidavit mentions "[t]he other traffic stop involving Darryl Washington a week before the search,"[13] there is "[n]o mention of who he bought [the seized crack cocaine] from." Doc. #32 at PageID 156–57. The government responds that "[it] is at a loss as to how [*Weaver*] supports [Franklin]'s position in this matter" because "[t]he facts underlying the search warrant were different in *Weaver*, which relied upon controlled buys to support the warrant;" and "there is certainly nothing in *Weaver* or any other reported decision that states that officers must conduct controlled buys to obtain the probable cause necessary to obtain a search warrant." Doc. #32 at 7.

Regarding *Cutwright*, Franklin contends that it is distinguishable from this case because "[h]ere, there is nobody who could or did say they saw illegal drugs in the house," though "there is someone who either intentionally or recklessly disregarded the truth, i.e., the Affiant, Investigator Washington." Doc. #32 at PageID 157. Specifically, Franklin argues that Washington "conveniently le[ft] out critical information," including "the unknown reliability of the May 2025 'citizen informant;' the mysterious bicyclist who approached Sardin and sold him the drugs; [and] Sardin lying to [her] during the interrogation." *Id.* Franklin adds that while Washington used information from "[a] citizen informant of unknown credibility," there was "not one example of

[13] In the affidavit, the first name of the person referenced is spelled "Darrell." Doc. #31-1 at PageID 77.

the use of an actual confidential informant – like the kind the Special Operations Unit of the Greenville Police Department used in prior, successful drug busts prosecuted in this Court and State Court."[14] Doc. #32 at PageID 157–58 (emphasis omitted). The government does not respond to Franklin's arguments regarding *Cutwright*.

"'Bare bones' affidavits typically 'contain wholly conclusory statements, which lack the facts and circumstances from which a magistrate can independently determine probable cause.'" *Pope*, 467 F.3d at 920 (quoting *Satterwhite*, 980 F.2d at 321). For example, affidavits "that merely state that the affiant 'has cause to suspect and does believe' or 'has received reliable information from a credible person and does believe' that contraband is located on the premises" are bare bones. *Id.* "The Court makes the 'bare bones' determination by evaluating the totality of the circumstances." *United States v. Thompson*, No. 1:22-cr-77, 2022 WL 17573905, at *4 (S.D. Miss. Dec. 9, 2022) (quoting *United States v. Robinson*, 741 F.3d 588, 597 (5th Cir. 2014)).

Here, Washington's affidavit was based on her direct conversation with the CI and her investigation into the tips from the confidential informant, which included two traffic stops in the 300 block of Muscadine Street that both led to the discovery of crack cocaine.[15] Given the amount of detail in the affidavit—including, similar to *Weaver*, dates and details of two traffic stops, the address of Franklin's residence, and a conversation between Washington and a citizen informant—it is immaterial that the affidavit did not contain certain information from Sardin's interrogation for the same reasons explained above. And as for Franklin's arguments that it is unclear from the affidavit whether the unnamed citizen informant was reliable and that the affidavit did not mention from where Darrell purchased crack cocaine, such are matters presumably considered by Judge

[14] Franklin does not cite any cases that illustrate "prior, successful drug busts prosecuted in this Court and State Court" in which the Special Operations Unit of the Greenville Police Department used a confidential informant.

[15] The affidavit included statements from four separate law enforcement officers, including Washington, who were present at Sardin's traffic stop. Doc. #31-1 at PageID 70–76.

Prewitt, whose "determination of probable cause [is] paid great deference." *Gates*, 462 U.S. at 236 (quoting *Spinelli v. United States*, 393 U.S. 410, 419 (1969), *abrogated on other grounds by Gates*, 462 U.S. 213). Finally, Washington's use of boilerplate statements do not automatically render the affidavit unreliable. *See United States v. Broussard*, 80 F.3d 1025, 1034 (5th Cir. 1996) ("The so-called 'boilerplate' assertions that Merritt complains of, which are based on the affiant's extensive experience and training and involve generalizations about the types of evidence that may be found in drug dealers' residences, do not undermine the reasonableness of reliance on the warrant."); *United States v. Ryan*, No. 24-40138, 2024 WL 4372695, at *1 (5th Cir. Oct. 2, 2024) (per curiam) ("Because the affidavit provided more than conclusory statements or boilerplate, the reliance on the search warrant, issued on the basis of the affidavit, was not unreasonable."). Washington's affidavit was not bare bones.

**4. Lack of presumed validity**

Franklin argues that the warrant was so facially deficient that the executing officers could not reasonably presume it to be valid because Washington's description of 333 Muscadine Street "is incorrect" since "while blue in color, it is not light blue, and [it] does not have black bars on the windows on the front of the residence;" and "there is … another house on Muscadine [that] fits the description," as it "is … light blue, has black bars on the front of the widows and has an air conditioner unit on the North side of the house." Doc. #31 at PageID 54–55 (citations omitted). Further, Franklin notes that "Sardin is quoted … as having said '331 Muscadine was where he bought the crack.'" *Id.* at PageID 56–57 (citations omitted).

The government responds that "there were certainly enough indicia of probable cause for officers with Greenville P.D. to rely in good faith upon the court's issuance of the warrant" because "[t]hey had complaints from citizens concerning drug trafficking in that area, specifically from the

location of 333 Muscadine Street;" and "[i]n the days shortly before the issuance of the warrant, officers witnessed two incidents of apparent drug trafficking from the location of 333 Muscadine Street, confirming the information obtained from local citizens." Doc. #38 at 6.

"An affidavit supporting a warrant carries a presumption of validity." *Symmank*, 387 F. App'x at 994 (citing *Franks*, 438 U.S. at 171). Here, the house at 333 Muscadine Street is wooden and blue in color, and has a black mailbox, as described in the affidavit. Doc. #31-2 at PageID 103–05. And that Washington, who authored the affidavit, was part of the search is significant because she personally compiled evidence leading to the search since she was present at the two traffic stops that occurred outside of 333 Muscadine Street, Doc. #31-1 at PageID 70–76; after being told by the CI that illegal narcotics were being dropped off at and sold from 333 Muscadine Street, she checked the land records and confirmed that Franklin owned the house, Doc. #31-4 at 24; and she was present when Judge Prewitt signed the search warrant, *id.* at 6. Moreover, the Greenville Police Department received constant complaints from concerned citizens regarding narcotics in the area near 333 Muscadine Street, and they were familiar with 333 Muscadine Street as a drug house. Doc. #31-1 at PageID 72. Further, as to the representation in the affidavit that Sardin claimed he bought drugs from 331 Muscadine Street, "an error in description is not always fatal" to the probable cause determination, *United States v. Scully*, 951 F.3d 656, 665 (5th Cir. 2020), considering "affidavits 'are normally drafted by nonlawyers in the midst and haste of a criminal investigation'" *Gates*, 462 U.S. at 235 (quoting *United States v. Ventresca*, 380 U.S. 102, 108 (1965)). Based on all this, Washington reasonably relied on the search warrant in good faith and presumed that it was supported by probable cause.

**5. Summary**

Because the Court concludes that the judge issuing the warrant was not misled by the

affidavit, that the affidavit was not bare bones, and that the executing officers reasonably could presume the warrant was valid, the good faith exception to the warrant requirement applies. The evidence obtained during the search of Franklin's residence under the warrant will not be suppressed.

### C. Probable Cause

Having concluded that the good faith exception applies, the Court need not address whether the affidavit established probable cause.[16] *United States v. Massi*, 761 F.3d 512, 525 (5th Cir. 2014) (quoting *United States v. Pena-Rodriguez*, 110 F.3d 1120, 1130 (5th Cir. 1997)).

## V
## Conclusion

For the reasons explained above, Franklin's motion to suppress [31] is **DENIED**.

**SO ORDERED**, this 5th day of October, 2026.

**/s/Debra M. Brown**
**UNITED STATES DISTRICT JUDGE**

[16] The Court notes, however, Franklin's argument that "the items sought were drugs, and what was allegedly located were two (2) pistols," without elaborating and without citing any authority relevant to such assertion. Doc. #32 at PageID 154. The government responds that "there was a long list of items sought during the search, including narcotics, indicia of narcotics trafficking, and firearms, all of which were found;" and earlier in its response states that "[a]mong other things, the warrant authorized the search for controlled substances, evidence of drug trafficking, and firearms." Doc. #38 at 3, 7. Franklin's failure to file a reply in support of his motion to suppress leaves the government's response assertions unaddressed. And Franklin's failure to adequately brief what the Court presumes is a challenge to the scope of the search under the warrant renders the argument waived and abandoned. *See United States v. Martinez,* 131 F.4th 294, 318 (5th Cir. 2025) ("Because Lightner failed to adequately brief his argument that the district court erred by denying his motion to strike as required by justice, he abandons that argument."); *United States v. Reagan*, 596 F.3d 251, 254 (5th Cir. 2010) ("Reagan, who is represented by appointed counsel, does nothing beyond listing these points of error—he offers no further arguments or explanation. This is a failure to brief and constitutes waiver."); *United States v. Torres-Aguilar*, 352 F.3d 934, 936 n.2 (5th Cir. 2003) (argument abandoned because defendant "only briefly mention[ed] it in a single footnote of [the] opening brief without providing any legal citations or analysis").

Regardless, the affidavit for the warrant contained an extensive list of items believed to be concealed at 333 Muscadine Street, including "controlled substances" and "firearms which may be used to protect drugs, drug proceeds, and drug trafficking activities, including handguns, rifles, shotguns and automatic weapons." Doc. #31-1 at PageID 64, 65 (emphases omitted). The warrant authorized the search for "controlled substances," among other things, but specified that it was *not* to be "interpret[ed] … as limiting … authority to seize all contraband and things the possession of which it'self [sic] is unlawful which [are found] incident to [the] search …." *Id.* at PageID 61.